MITCHELL (SHAW v.). See Case No. 12,722.

MITCHELL (SICKELS v.). See Case No. 12,-835.

MITCHELL (SILVERTHAIN'S ASSIGNEE v.). See Case No. 12,859.

## Case No. 9,669.

### MITCHELL v. THOMPSON et al.

[1 McLean, 96.] [1]

Circuit Court, D. Tennessee. Sept. Term, 1830.

PUBLIC LANDS—ENTRY AND SURVEY—ERRORS—FRAUD—STATUTE OF LIMITATIONS.

1. The land law of North Carolina, under which the land titles in Tennessee principally originated, is different from the Virginia law.

2. An entry must be surveyed in a square or oblong, if no form be expressed in the entry.

3. Errors in the survey should be corrected in a reasonable time.

4. A fraudulent title may be protected by the statute of limitations, from the time the fraud was discovered. And on the same principle may lapse of time be relied on. There is no reason why the statute should not begin to run from the time the fraud is discovered.

[Cited in Carr v. Hilton, Case No. 2,437; Tyler v. Angevine, Id. 14,306; Bailey v. Glover, 21 Wall. (88 U. S.) 348.]

[Cited in Wear v. Skinner, 46 Ind. 266.]

5. It is important that the facts, on which the fraud depends, should be investigated whilst they are within the recollection of witnesses.

6. Courts in England and in this country are more favorable now than formerly to the policy of the statute of limitations. It tends to the peace of society. Courts in England, in some modern cases, have regretted that they are bound by former adjudications, in many instances, to give little weight to the policy of statutes of limitations, which are properly denominated statutes of repose.

[This was a suit by David Mitchell against John Thompson and Sampson Williams for the possession of certain real property.]

Mr. Gibbs, for complainant.
Mr. Anderson, for defendants.

OPINION OF THE COURT. The complainant states in his bill, which was filed the 15th of June, 1824, that being entitled to a right of pre-emption, on the 17th of July, 1794, he entered six hundred and forty acres of land, lying on Brown's creek, adjoining a conditional line between the heirs of Roger Tapp and the complainant on the lower side; then running up the creek to adjoin a conditional line made with Samuel Barton by Roger Tapp, in behalf of the complainant; thence, as the law directs, so as to include his spring and improvement; that this entry was as-

[1] [Reported by Hon. John McLean, Circuit Justice.]

signed to Joseph Erwin, who afterwards reconveyed it to the complainant. That, the 22d of October, 1791, Sampson Williams, knowing that the complainant had made the entry aforesaid, and the situation thereof, made an entry including about two hundred acres of the land covered by complainant's entry, and the 17th of April, 1793, obtained a grant therefor. That, being a deputy surveyor, the defendant Williams, on the 10th of December, 1792, made a survey of complainant's entry, and fraudulently, for the purpose of securing to himself a part of the land entered by the complainant, made the survey in such way as to exclude a part of the land covered by his entry, and extended it on land which had been appropriated by others. On this survey a grant was obtained. The bill further states, that Sampson Williams, two or three years before the filing of the bill, conveyed the land granted to him to John Thompson, one of the defendants, for little or no consideration, and who had full notice of the fraud before he received the conveyance. A decree for so much of the land granted to Williams as is included in complainant's entry is prayed for. In his answer, Thompson denies all knowledge of the fraud, and alleges that he purchased the land for two hundred and eighty-five dollars, a low price, on account of an interference of a survey of Thomas Thompson's pre-emption, and of the entry of one Davis. Williams also denies all fraud, and says that complainant and Erwin were present, and directed the survey. He says, from the thick growth of cane at that early day, it was difficult to make surveys accurately. Both defendants rely on the statute of limitations, length of time, &c. As stated in the bill, the entry of Mitchell was made on the 17th of July, 1784. It was transferred to Erwin on the 20th of December, 1785; and surveyed by Sampson Williams on the 29th of November, 1792. On this survey, one grant was issued on the 26th of June, 1793, for 401½ acres, and another for 582½ acres, dated June the 26th, 1793. The 20th of August, 1794, Erwin conveyed the 401½ acres to the complainant, and the 8th of February, 1811, by his attorney, conveyed the other tract. Sampson Williams' entry was made on the 22d of October, 1791, and surveyed October the 15th, 1792. The grant was issued the 27th of April, 1793.

The testimony is very voluminous. A great number of depositions have been read, a part to prove facts pertinent to the case; and a part to impeach the credibility of witnesses. In the discussion several points were made, and the facts in support of them respectively were adverted to; and also the principles of law which were deemed applicable to each. The last ground assumed in the defence is, that, under the circumstances of the case, the relief prayed for in the bill is barred by the lapse of time. This point will be first examined. The complainant contends that his entry was fraudulently surveyed, by Williams

the defendant, in such a way as to include the quantity, by interfering with older entries, and so as not to interfere with the junior entry which he had made. The claim of the complainant rests exclusively on the assignment of the right which Erwin is supposed to have had, to have the original entry accurately surveyed after it had been carried into grant, as above stated. The land law requires the surveyor to survey entries according to their priorities in date, either in a square or oblong figure. By the construction given the acts, under which such titles are acquired, in this state, the surveyor is not subject to the control of the enterer, further than his wishes may have been expressed in the calls of the entry. The surveyor is to act according to his own discretion in making the survey, with the single exception of a case where a conventional line has been agreed upon by persons where lands adjoin. The statute of 1796 provides a special mode by which the mistakes of a surveyor, in platting or making out certificates to the secretary's office, &c. may be corrected; but there seems to be no statutory provision for correcting the survey after the grant has been issued. An entry gives a right to the enterer, and if the form of the entry be not given in its calls, nor elder rights control it, the discretion of the surveyor must be exercised in giving the survey a square or oblong figure. If a subsequent entry be made which covers a part of the first, the elder entry may be surveyed without reference to the other, although it may have been surveyed and carried into grant. In such a case, it has been held that the elder entry may be surveyed in an oblong form, at the discretion of the surveyor, although a square figure might not interfere with the junior entry and survey. The surveyor is a public officer, and his mistakes, it is said, are not to prejudice the enterer; but it seems no where to be decided, that these mistakes may be corrected at any future time, after the emanation of the grant, by the aid of a court of chancery.

A court would undoubtedly take cognizance of the right of an enterer, if his entry had never been surveyed, on a caveat being filed to prevent an emanation of a grant for the same land, under a junior entry. And there may be cases in which the grantee, under a junior entry, has been decreed to convey his right to the elder enterer who held the superior equity. Although the mode of making entries under the land law of Virginia, as construed by the courts of Kentucky, is different from the land law of North Carolina, under which titles were acquired in Tennessee, yet no strong reason is perceived why the effect of a survey should be different. In both cases the surveyor is a public officer, whose duties are prescribed by law. Under the Virginia law it has been ruled frequently, that the survey of an entry fixes its limits, which cannot, afterwards, be altered to the prejudice of rights subsequently acquired. In

the case of Galt v. Galloway, 4 Pet. [29 U. S.] 340, the supreme court say, "When an entry is surveyed, its boundaries are designated, and nothing can be more reasonable and just than that these shall limit the claim of the locator. To permit him to vary his lines so as to affect, injuriously, the rights of others, subsequently acquired, would be unjust." Until an entry shall be surveyed, unless its calls prescribe the form, a subsequent enterer cannot tell whether the survey will be executed in a square or oblong; and, consequently, he can acquire no rights which shall control the surveyor in running the elder entry. But if the elder entry has been surveyed, is it not notice to subsequent enterers of the limits of the entry. It is not the duty of every enterer to see that the survey has been accurately made; and if the surveyor, either through mistake or design, should disregard prior entries, and fix the boundaries so as to interfere with a paramount right, is he not bound within a reasonable time, to have the error corrected in any mode authorized by law? As there seems to be no provision in the statute on the subject, I doubt whether, afterwards the survey can be altered, to the prejudice of a junior right, so as to conform more strictly to the calls of the entry. It is believed that no court has decided that this may be done under the Virginia land law; and on this point no important distinction is perceived between the land law of North Carolina, and that of Virginia. Under the former law, the enterer, in many instances, purchased his land of the state at a fixed price, and under the Virginia act, locations were made on account of rights granted for military services. In both cases the right to enter land was given for a valuable consideration. If an error of the surveyor could be corrected at any future period, would it not produce great uncertainty in land titles? Although the legal form has been given to the survey, and it has been carried into grant, yet if it interfere with elder rights under this doctrine, the enterer may claim the right of re-surveying the entry, so as to include the number of acres called for, and avoid any conflict with superior equities. And this, too, in defiance of rights subsequently acquired. This would introduce a degree of uncertainty in land titles, in this state, against which there could be no effectual protection but the statute of limitations. No matter how long the elder entry had been surveyed, patented, and occupied by the claimant; no subsequent enterer or his assignee who was not sheltered by the statute of limitations, would be safe if any part of his land could be covered by a legal construction of the first entry. It may have been surveyed in an oblong, which causes an interference with a paramount claim, when a square figure would avoid this interference. This latter figure, according to this doctrine, may be given to the survey, at any future period to the destruction of junior entries.

This doctrine would seem to be fraught with too much injustice, to bona fide claimants, to be sanctioned; and it is believed that no decision has sustained it. A reasonable diligence, at least, should be imposed upon the elder enterer, to correct the errors of the survey after the grant shall have issued.

The complainant's counsel do not rely so much upon this doctrine as sustaining their right to a decree, as they do on the fraud which was committed by Samuel Williams, in making the survey. He interfered, it is contended, with the elder entries, with the express view of securing to himself the residue of the vacant land, and which ought to have been covered by Mitchell's survey. It is understood, then, that the fraud is the principal ground relied on by the complainants. At the time of the survey Erwin was the owner of Mitchell's entry; so that if a fraud were committed by Williams in making the survey, it was committed against Erwin and not Mitchell. He had long before sold to Erwin all his interest in the entry. In 1794, Erwin conveyed to Mitchell the 401½ acres, about which there is no dispute; but it was not until 1811, that the right growing out of this fraud was assigned. More than eighteen years had elapsed, from the time this alleged fraud was committed before the right of action was assigned to Mitchell. As no reference was made to this right, when the land was re-conveyed to Mitchell, it cannot be considered as appendant to that conveyance. It was an attempt to transfer a distinct and substantial right, and might as well have been invested in a stranger as in Mitchell. There is nothing then in Mitchell having been the first enterer, or the grantee of the 401½ acres, which gives any validity to his claim, under the assignment of 1811, that might not have been claimed under an assignment to any other individual. No injury had been done to the rights of Mitchell in making the survey. He is a volunteer purchaser and, perhaps, a speculator in the right set up. And he was a purchaser with a full knowledge of all the facts. It is impossible to suppose from the nature of the right asserted, that he could have been ignorant of the circumstances under which it originated. Had the bill been filed by Erwin, against whom the alleged fraud was committed, and whose interests were prejudiced by it, there would have been equitable considerations, which, if not inapplicable to the case, as now presented, are at least, far less forcible. We deem it unnecessary to investigate the nature of this right, for the purpose of ascertaining whether it is such an interest as can be transferred, so as to give a right of action to the assignee. There are other lights, in which the merits of the case may be considered. More than thirty years had elapsed from the time this survey was executed, until the filing of this bill. But it is said that the statute of limitations does not begin to run, nor the lapse of time in such a case, until the fraud is discovered. This is, as it regards the operation of the statute, a correct rule of law. At what time was this fraud discovered. Could Erwin, who lived in the neighborhood of the land, at the time it was surveyed, and for many years afterwards, have remained ignorant of it. The facts were before him, and he must have seen them, unless he closed his eyes against them. If he had notice or might have discovered the fraud, by the most ordinary diligence, is he not justly responsible for all the consequences of negligence. He might have traced the surveys of the adjoining tracts, and ascertained the dates of their respective entries, and the corners called for. Under all circumstances the law imposes an ordinary degree of vigilance, for the protection of rights. Can Mitchell set up any greater right, under this judgment. If the equity of the assignee should be considered equal to that of the assignor, about which doubts are entertained, it is clear that it cannot be greater. The assignment cannot be assimilated to a conveyance of land, by a fraudulent holder, to a purchaser without notice, and for a valuable consideration.

For several years past the courts both in England and in this country, have given a more favorable consideration to the statutes of limitations than formerly. The slightest pretext was once considered sufficient to take a case out of the statute; and in many modern decisions, the courts of England have regretted that they were bound to decide, by the force of prior adjudications, in violation of the policy of those statutes. The salutary effect of this policy is seen and acknowledged, and courts now endeavor to promote it. These statutes by withholding the remedy, after a limited period, impose reasonable diligence in the assertion of rights. They promote peace and harmony in society. By closing the door of litigation, they give security and confidence to the occupant, and his labor is cheerfully bestowed in the improvement of his estate. His domestic comforts are enlarged by the reflection, that he will enjoy the fruits of his industry. The principle of law founded upon lapse of time when judiciously applied, has the same salutary effect upon society. It may require a less degree of diligence than is required by the statute of limitations, in general, but the policy is the same. The statute of limitations may be set up in defence, in behalf of a claim founded in fraud, if a knowledge of the facts, which constitute the fraud were possessed by the adverse claimant. In neglecting to prosecute, he is presumed to acquiesce in the fraud; and after the statute has run the law will not aid him. This principle applies with equal, if not greater force to a claim which has lain dormant more than thirty years.

The facts relied on to show the fraud, in the case under consideration, except the fraud charged against Williams in making the chinkapin corner, were known or might

have been known to Erwin, in 1792, when the survey was executed. He takes no step to correct the error, or obtain relief from the alleged fraud. If Williams were guilty of fraud he was liable to an action for damages. From the year 1792 until 1811, a period of more than eighteen years, this right of action, or interest in the entry, arising from the alleged fraud of the defendant Williams remained in Erwin. But it seems he did not assert his right in any form; and it was not until the further lapse of nearly fourteen years, after the assignment, that the first step was taken by Mitchell to prosecute this suit. How are these delays to be accounted for? Mitchell it is said, is a resident of North Carolina. But did he not understand the nature of the right which was assigned to him by Erwin. He must have understood it, unless indeed the assignment was made to him without his knowledge. In the case of Townshend v. Townshend, 1 Brown, Ch. 551, the court on a possession of thirty years, by the defendants, presumed that the settlement, under which the complainant claimed was voluntary, and dismissed the bill. And in the case of Andrew v. Wrigley, 4 Brown, Ch. 125, where an executor had sold the testator's term specifically devised, under strong circumstances of fraud, Lord Thurlow refused relief from the lapse of time, although his decision would have been different, if an earlier application had been made. The same principle was recognized in the case of Morse v. Royal, 12 Ves. 373, and also in Beckford v. Wade, 17 Ves. 88. In the case of Bonney v. Ridgard, 1 Cox, Ch. 145, relief was refused from the lapse of time, though from the face of the assignment, fraud was apparent. And in a later case of Blennerhassett v. Day, 2 Ball & B. 104, it was decided, that "where the facts constituting fraud are in the knowledge of the party, and he lies by for twenty-five years, he cannot get relief." This doctrine is illustrated with great ability, by Lord Reddesdale, in Hovenden v. Lord Annesley, 2 Schoales & L. 608. In Peck [Tenn.] 30, an able and learned opinion is given, by the supreme court of this state in the case of Porter's Lessee v. Cocke, in which it is decided that fraud not being an exception in the statute of limitations, a deed, fraudulent against creditors, with possession, will constitute a bar. Where no interest has been paid, and the mortgagee has been in possession of the mortgaged premises for twenty years, and no special circumstances being shown, the mortgagor is barred from the equity of redemption. And also where the mortgagor has remained in possession for the same term, without the payment of interest or on such acknowledgment that the mortgage is still existing, he may rely on the lapse of time, against a bill to foreclose, and the court will presume the money paid. [Hughes v. Edwards] 9 Wheat. [22 U. S.] 489.

In these cases lapse of time is considered as operating by way of evidence, to show payment or satisfaction of the demand. There is no reason why the statute should not run in a case of fraud, after it comes to the knowledge of the party, as in any other case. It is important that the facts which constitute the fraud, should be investigated while they may be within the recollection of witnesses; and while the party implicated may be able to explain the circumstances. For this reason, even in cases of fraud, courts of chancery feel themselves bound by the statute. The spirit and policy of the statute are regarded, the same in chancery as at law. But, in the case under consideration, the fraud charged in the bill is denied by the answers; and Thompson insists that he is an innocent purchaser, for a valuable consideration, without notice. He purchased the land in dispute, paid the consideration, and received a conveyance about two years before the commencement of this suit. The consideration paid for this land is admitted to be inadequate, but it is alleged it was sold below its value, on account of the interfering claims of Thomas Thompson and one Davis. Sampson Williams, in his answer, denies all knowledge of interfering rights elder than Mitchell's when he made the survey. If the north-west cornor of Thomas Thompson's pre-emption should be established at the chinkapin oak as claimed by him, and Williams had knowledge of the fact; or if he did not in fact make that corner, or know that it was fraudulently made, there would be no sufficient ground to sustain the allegation of fraud. Duffield and Ellis swear that this corner was made in 1787 by Sampson Williams and Thomas Thompson, which is two years after Thompson's pre-emption is stated to have been surveyed. But both of these witnesses have been discredited, at least so far, as to render their statements under oath questionable; and in this particular they are positively contradicted by the oath of Thomas Thompson. Jason Thompson states that in 1789, Sampson Williams was at the red bud and white oak corner, but his credibility is impeached. Several witnesses of great respectability, and who have been long acquainted with the survey of Thompson, believe that the tree named is the north-west corner of Thompson's survey. Buchanan, an experienced surveyor and a man of high respectability, states that he marked Thompson's northwest corner, and that Mitchell's survey could not have been otherwise surveyed than it was, without interfering with the adjacent tracts. That the witness was usually directed by the owner in making surveys, where the calls of the entry were vague. Sampson Williams, it appears, lived six or seven miles from Mitchell's entry when he surveyed it, and was but little acquainted with the lines in the neighborhood, and had been a surveyor but a short time.

In making the survey, Thompson states that the surveyor acted under the direction of Matherall and himself. The cane was thick, so that it was extremely difficult to ascertain distances accurately, and great danger was apprehended from the Indians.

The above facts go very far to rebut the inferences of fraud, which are drawn from the facts of the case. They at least render the fraud charged extremely doubtful. If Buchanan, after tracing the lines and ascertaining the connections of the different entries, at this day, is able to say that Mitchell's survey was accurately and properly run, doubt may well exist whether, under the embarrassing circumstances which existed at the time Williams made the survey, there is sufficient ground to charge him with fraud. But it is contended that the entry of Williams shows he had a knowledge of the interfering claims. That entry calls to begin "at a black oak and mulberry, south corner of Thomas Thompson's pre-emption, running west and north, to include the vacant land between said Thompson's pre-emption, the heirs of Nicholas Gentry's pre-emption, and east and north to include the surplus land within the bounds of said Thompson's pre-emption." The act of 1787 authorizes an entry of the surplus land, as above described. The call for the black oak and mulberry, the south-west corner of Thompson's pre-emption, and the other calls of the entry, do not necessarily show that Williams was acquainted with the boundaries of Gentry's, Barton's and Tapp's claims, which interpose with the survey of Mitchell's entry. Believing that there would be surplus land in Thompson's pre-emption, he wished to cover it by his entry.

Under all the circumstances of the case, it does not appear that the charge of fraud is sustained; but if it were the lapse of time and knowledge of the facts possessed by Erwin would bring the case within the decisions referred to. The defendant, Thompson, is a purchaser without a knowledge of the circumstances which constitute the fraud if it exist; and the right set up by the complainant came into his possession by purchase with a knowledge of the facts. The land claimed by Thompson has been possessed more than twenty years, and valuable improvements have been made on it. Can a court of chancery in such a case give the relief prayed for. The right asserted by the complainant, was stale when he purchased it, and he has, to use a common expression, slept on it. If, under the circumstances, this was a doubtful right, when it was assigned to the complainant, it is much more so now. If the objection of staleness could then have been urged against it, the same objection must now be insuperable. Forty years have nearly elapsed since this survey was executed, and more than thirty years before the complainant's bill was filed. The repose of society seems to require that more diligence should be used in the investigation of controverted rights, than has been shown in this case. It is enough to settle the disputes of the present generation, without looking into the dormant transactions of the past. The bill must be dismissed at the costs of the complainant.